Odis Williams
The Law Office of Odis W. Williams
1640 Powers Ferry Road
Building 20, Suite 300
Marietta, GA 30067
770-575-4466
owilliams@odiswilliamspc.com

Keith Altman
(*pro hac vice to be applied for*)
The Law Office of Keith Altman
33228 West 12 Mile Road - Suite 375
Farmington Hills, MI 48331
516-456-5885
kaltman@lawampmmt.com

**Attorneys for Plaintiff**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| DEQUAVIUS PICOU, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, and UNIVERSITY OF WEST GEORGIA | Case No.<br><br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Dequavius Picou, ("Quay") individually and on behalf of all others similarly situated,  brings this Class Action Complaint and Demand for Jury Trial against Defendant National  Collegiate Athletic Association ("NCAA") and University of West Georgia ("UWG") to obtain redress for injuries sustained as a result of  Defendant's reckless disregard for the health and safety of generations of University of  West Georgia  student-athletes. Plaintiff alleges as follows upon personal knowledge  as to himself and his own acts and experiences and, as to all other matters, upon information and  belief, including investigation conducted by his attorneys.

## INTRODUCTION

1.      Nearly one hundred thousand student-athletes sign up to compete in college  football each year, and it's no surprise why. Football is America's sport and Plaintiff and a Class  of football players (defined below) were raised to live and breathe the game. During football  season, there are entire days of the week that millions of Americans dedicate to watching the  game. On game days, hundreds of thousands of fans fill stadium seats and even more watch  around the world. Before each  game, these players—often mere teenagers—are riled up and told to do whatever it takes to win and, when playing, are motivated to do whatever it takes to keep  going

2.      But up until 2010, Defendant NCAA kept players and the public in the

dark about an epidemic that was slowly killing college athletes.

3.      During the course of a college football season, athletes absorb more than 1,000 impacts greater than 10 Gs (gravitational force) and, worse yet, the majority of football-related hits to the head exceed 20 Gs, with some approaching 100 Gs. To put this in perspective, if you drove your car into a wall at twenty-five miles per hour and weren't wearing a seatbelt, the force of you hitting the windshield would be around 100 Gs. Thus, each season these 18, 19, 20, and 21-year-old student-athletes are subjected to repeated car accidents.

4.      Over time, the repetitive and violent impacts to players' heads led to repeated concussions that severely increased their risks of long-term brain injuries, including memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, and other related symptoms. Meaning, long after they played their last game, they are left with a series of neurological conditions that could slowly strangle their brains.

5.      For decades, Defendant NCAA and UWG knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from playing college football, but recklessly disregarded this information to protect the very profitable business of "amateur" college football.

6.      While in school, UWG football players were under Defendants' care. Unfortunately, Defendant did not care about the off-field consequences that would

haunt students, like Plaintiff Picou, for the rest of their lives. Despite knowing for decades of a vast body of scientific research describing the danger of traumatic brain injuries ("TBIs") like those Plaintiff experienced, Defendant failed to implement adequate procedures to protect Plaintiff and other UWG football players from the long-term dangers associated with them. They did so knowingly and for profit.

7.      As a direct result of Defendant's acts and omissions, Plaintiff and countless former UWG football players suffered brain and other neurocognitive injuries from playing NCAA football. As such, Plaintiff brings this Class Action Complaint and Demand for Jury Trial in order to vindicate those players' rights and hold the NCAA and UWG accountable.

## PARTIES

8.      Plaintiff Quay Picou is a natural person and citizen and resident of Georgia.

9.      Defendant NCAA is an unincorporated association with its principal place of business located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA is not organized under the laws of any State, but is registered as a tax-exempt organization with the Internal Revenue Service. As such, Defendant NCAA is a citizen of the State of Indiana pursuant to 28 U.S.C. § 1332(d)(10). The NCAA has significant and continuous contacts with Georgia and oversees athletics for numerous institutions of higher education in Georgia.

10.     Defendant University of West Georgia is a public university located at

1601 Maple St., Carrollton, GA 30118.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the Class, which consists of at least 100  members, is a citizen of a different state than Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection  apply to this action

12.    This Court has personal jurisdiction over Defendants NCAA because they  conduct  significant business in this District, including establishing consumer and business contracts here,  and because it maintains its principal place of business in this District.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial  part of the events and omissions giving rise to Plaintiff's claims occurred in and/or emanated  from this District.

## FACTUAL BACKGROUND

### I.    Defendants Had A Duty to Protect UWG Student-Athletes, Including Plaintiff.

14.    The NCAA is the governing body of collegiate athletics that oversees twenty-  three college sports and over 400,000 students who participate in intercollegiate athletics,  including the football program at UWG. According to the NCAA, more than 1,200 schools,  conferences and affiliate organizations collectively

invest in improving the experiences of athletes—on the field, in the classroom, and in life.

15.     The NCAA brings in more than $750 million in revenue each year and is the most significant college sports-governing body in the United States. The NCAA plays a significant role in governing and regulating the UWG football program and owes a duty to safeguard the well-being of its student-athletes. In fact, since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[1] The IAAUS was specifically formed for this purpose because, at the turn of the twentieth century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. After several subsequent meetings of colleges, the NCAA was established.[2]

16.     As such, the genesis of the NCAA was for a singular goal: "to keep college athletes safe.[3]"

_____

[1] *Who We Are*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/about/who-we-are (last visited September 29, 2020).

[2] In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

[3] *Well-Being*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/health-and-safety

17.     The overarching principles of the NCAA, including its purported commitment to  safeguarding its athletes, are contained in the NCAA Constitution. The NCAA Constitution  clearly defines the NCAA's purpose and fundamental policies to include maintaining control  over and responsibility for intercollegiate sports and athletes. The NCAA Constitution states:

> The purposes of this Association are:
>
> (a)  To initiate, stimulate and improve intercollegiate athletics programs for student-athletes ...;
>
> (b)  To uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with  the constitution and bylaws of this Association;

 NCAA Const., Art. 1, § 1.2(a)(b).

18.     The NCAA Constitution also defines one of its "Fundamental Polic[ies]" as the  requirement that "[m]ember institutions shall be obligated to apply and enforce this legislation,  and the infractions process of the Association shall be applied to an institution when it fails to  fulfill this obligation." NCAA Const., Art. 1 § 1.3.2.

19.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of  Student-Athlete Well-Being," and provides:

> **2.2 The Principle of Student-Athlete Well-Being.**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes. (Revised: 11/21/05[.])

_____

(last  visited September 29, 2020).

### 2.2.3 Health and Safety.

It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. (Adopted: 1/10/95[.])

20.     To accomplish this purpose, the NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. Both NCAA member institutions, including schools like UWG, and NCAA conferences are obligated to abide by the NCAA's rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2 § 2.8.1.

21.     The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor

8

intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

22.     The NCAA, therefore, holds itself out as both a proponent of and authority on the  treatment and prevention of sports-related injuries upon which NCAA athletes (including  Plaintiff Picou), UWG, and all other member institutions can rely for guidance on  player-safety issues.

23.     Plaintiff Picou—and football players at UWG—relied upon the NCAA's authority and  guidance to protect his health and safety by treating and preventing head-  related injuries, including the effects of those head injuries later on in his life.

24.     As compared to Plaintiff and other UWG football players, the NCAA was in a  superior position to know of and mitigate the risks of sustaining concussions and other TBIs  while playing football at Michigan. It failed to do so.

## II.     Decades of Studies Firmly Establish the Dangers of Football-Related Concussions.

25.     Throughout the twentieth century and into the twenty-first century, studies have  firmly established that repetitive and violent impacts to the head can cause concussions and  TBIs, with a heightened risk of long-term injuries and impacts, including—but not limited to—  memory loss, dementia, depression, Alzheimer's disease, Parkinson's disease, and CTE.

26.     Such violent impacts to the head are a one-way street for those who

experience  them. As Jonathan J. Russin—Assistant Surgical Director at the USC Neurorestoration Center at  the Keck School of Medicine—has stated, "there's no way to undo a traumatic brain injury," and  one's "best bet is to avoid concussions altogether.[4]"

27.    To better understand the results of these studies, a brief introduction to concussions in football follows.

A.    <u>An Overview of Concussions in Football</u>.

28.    A TBI is an injury to the brain that comes as the result of the application of either  external physical force or rapid acceleration and deceleration forces, which disrupts brain  function in a manner that causes impairments in cognitive and/or physical function.

29.    A concussion is a TBI initiated by an impact to the head, which causes the head  and brain to move rapidly back and forth. The movement causes the brain to bounce around or  twist within the skull, damaging brain cells and leading to harmful chemical changes in the brain.

30.    The human brain is made of soft tissue, cushioned by spinal fluid, and encased in  a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against  the skull. But relatively minor impacts—including not only

_____

[4] Deanna Pai, *Do Concussions Increase the Risk of Stroke or Brain Cancer?*, Keck Med. of  USC, https://bit.ly/2MzSkkC (last visited September 29, 2020).

direct blows to the head, but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

31.     Concussions typically occur when linear and rotational accelerations impact the brain through either direct impact to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown that athletes can receive more than 1,000 impacts greater than 10 Gs. This is slightly more force than a fighter pilot receives from performing maximal maneuvers. The majority of football-related hits to the head exceed 20 Gs, with some going well over 100 Gs.

          i.                  *Concussion Symptoms.*

32.     When a collegiate athlete suffers a severe impact to the head, they may experience concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- memory loss;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance;

- feeling anxious or irritable for no apparent reason; and

- feeling overly tired.

33.    A collegiate athlete may not recognize the signs and/or symptoms of a concussion, and, more often, the effect of the concussion itself prevents them from recognizing them. Because of that, they may put themselves at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

ii.    *Post-Concussion Treatment.*

34.    After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is particularly vulnerable to further injury. Even after the immediate effects have worn off, a person who has suffered a concussion is four to six times more likely to receive another concussion than a person who has been concussion-free.

35.    The length of the healing process varies from person to person and from conncussion to concussion. Symptoms may even last for one or two weeks

36.    Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months, and sometimes can even be permanent. Generally,

people suffering from post-  concussion syndrome are referred to specialists for additional medical help.

37.    Still, many people think of concussions as short-term, temporary injuries. However, decades of scientific research demonstrate the effects of concussions are anything but  temporary.

B.    Studies Confirm the Dangers and Long-Term Effects of Concussions.

38.    Two of the leading studies of the long-term effects of concussions were conducted  by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury  Research Institute. These studies showed the "devastating consequences" of repeated  concussions, including that they lead to an increased risk of depression, dementia, and suicide.  These studies have also demonstrated that repeated concussions trigger progressive degeneration  of the brain tissue, including the build-up of an abnormal protein called the tau protein.

39.    In his early studies, Dr. Robert Cantu of the Boston University Center for the  Study of Traumatic Encephalopathy found evidence of CTE in 90 of 94 (96%) autopsied brains  of former NFL players. A recent update to these studies found CTE in a staggering 110 of 111  (99%) former NFL players and 48 of 53 former college players (91%)[5].

_____

[5] Jesse Mez, MD, MS, *et al*., *Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of American Football*, 318 JAMA 4, 360–370 (2017).

40.     These more recent studies were neither aberrations nor surprises but confirmations of what was already known or readily apparent from the existing medical literature.

41.     Studies like these, which establish the devastating dangers related to TBIs, date back to the early twentieth century. For example, in an article in the 1905 multi-volume medical text *A System of Medicine*, surgeon Sir William Bennett noted that the dangers from TBIs can arise just as easily when "no loss of consciousness occurs at all[,]" and that such injuries "may in the end have far graver results" due to their "escap[ing] treatment altogether in the first instance" given their less severe appearance. [6] Bennett noted that the imposition of a strict treatment regimen immediately after an injury, during initial recovery, and following the initial recovery period, was essential to the "treatment of all cases of concussion of the brain, whether they be severe or slight."

42.     Some early articles from this period began to recognize the unique dangers presented by football, specifically. The editors of the *Journal of the American Medical Association* recognized the long-term risks of such head injuries very early on, writing in 1905 that "[t]o be a cripple or lunatic for life is paying high for athletic emulation" via football[7]. Similarly, the risks of concussion in football were discussed in a 1906 article by Dr. Edward Nichols, who observed that a

_____

[6] Sir William Bennett, *Some Milder Forms of Concussion of the Brain*, A Sys. of Med. Vol. 8 231-32 (2d ed. 1910).

[7] Editors, *The Football Mortality*, 39 JAMA 1464 (1905).

14

concussed player might go through multiple plays before his teammates noticed his altered mental state[8].

43.     Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science began to clearly recognize the debilitating effects of concussions and other TBIs, connect it to contact sports (including football), and find that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

44.     For instance, in 1927, Drs. Michael Osnato and Vincent Giliberti discussed a disease they called traumatic encephalitis in an article on post-concussion damage in *Archives of Neurology & Psychiatry*, concluding that brain disease could manifest in "young men knocked out in football and other games," but noting that the issue had "not received adequate attention.[9]" Then, in 1928, Pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head[10].

45.     Countless studies were later conducted on boxers suffering chronic

---

[8] Edward Nichols, *The Physical Aspect of American Football*, 154 Boston Med. & Surgical J.1 (1906).
[9] Michael Osnato & Vincent Giliberti, *Postconcussion Neurosis-Traumatic Encephalitis*, 18 Archives of Neurology & Psychiatry 181 (1927).
[10] Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

neurological  symptoms as a result of repeated head injuries, and who displayed signs of dementia and   impairment of motor functions [11] . As incidents of chronic encephalopathy increased, they were  often characterized as a "Parkinsonian" pattern of progressive decline. However, in a chapter of a   mid-twentieth century book on brain injuries, psychiatrists Karl M. Bowman and Abram Blau   coined the term "chronic traumatic encephalopathy" to explain the deterioration of a boxer's  mental state over time[12].

46.    In 1936, Dr. Edward J. Carroll, Jr. wrote an article further recognizing "punch-drunk syndrome's" seriousness, stating that "no head blow is taken with impunity, and [] each knock-out causes definite and irreparable damage. If such trauma is repeated for a long enough period, it is inevitable that nerve cell insufficiency will develop ultimately, and the individual will become punch-drunk." He also noted that in addition to boxers, punch drunk had been recognized among football players[13].

47.    The next year, the American Football Coaches Association published

---

[11] *See*, *e.g.*, E. Guttmann & C.E. Winterstein, *Disturbances of Consciousness After Head Injuries: Observations on Boxers*, 84 J. of Mental Sci. 347 (Mar. 1938); Harry L. Parker,  *Traumatic Encephalopathy ('Punch Drunk') of Professional Pugilists*, 15 J. of Neurology &  Psychopathology 20 (July 1934); C.E. Winterstein, *Head Injuries Attributable to Boxing*, 2  Lancet 719 (Sept. 1937).

[12] K.M. Bowman & A. Blau, *Psychotic States Following Head and Brain Injury in Adults  and Children*, Injuries of the Skull, Brain and Spinal Cord: Neuropsychiatric, Surgical, and  Medico-Legal Aspects 309 (S. Brock, ed. 1940).

[13] Edward J. Carroll, Jr., *Punch-Drunk*, 191 Am. J. Med. Sci. 706 (1936).

a report warning that players who suffer even "one concussion" should be removed from play[14].

48.      In 1952, an article published in *The New England Journal of Medicine* first recommended a "three-strike rule" for concussions in football, demanding that players cease to play football permanently after receiving their third concussion[15].

49.      Starting in the late 1960s, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. John R. Hughes and D. Eugene Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs")[16]. Several years after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling the skull cannot accommodate.

50.      In 1975, the Chief Medical Officer of the British Boxing Board of Control suggested boxers were not the only persons or athletes vulnerable to the risk of long-term brain injuries, stating:

>                Irreversible brain damage caused by regular excessive punching

---

[14] Proceedings of the Seventeenth Annual Meeting of the American Football Coaches Association (Dec. 29, 1937) ("Sports demanding personal contact should be eliminated after an individual has suffered a concussion").

[15] Augustus Thorndike, *Serious Recurrent Injuries of Athletes— Contraindications to Further Competitive Participation*, 247 New Eng. J. Med. 554, 555-56 (1952).

[16] John R. Hughes & D. Eugene Hendrix, *Telemetered EEG From A Football Player In Action*, 24 Electroencephalography & Clin. Neurophysiology 183 (1968).

can cause a boxer to become punch drunk, a condition known euphemistically in medical terms as [Chronic] Traumatic Encephalopathy. The condition can be caused by other hazards of contact sports—taking too many falls whilst hunting or steeple chasing or the continual use of brute force rather than skill in the rugby field or heading a football incessantly over many years. Anything which entails intermittent trauma to the head can cause it[17].

51.     Overall, countless studies—published in prominent medical journals such as the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*—warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions and head injuries. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;
- traumatic encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;
- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) in the brainstem;
- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;
- immediate retrograde memory issues occur following concussions;
- head injuries require recovery time without risk of subjection to further injury;
- a football player who suffers a concussion requires significant rest before being subjected to further contact; and
- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and

---

[17] J.W. Graham, *Eight, Nine, Out! Fifty Years as Boxer's Doctor*, 56 (1975).

reduced speed of information processing.

52. As a result of these studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

53. By 1991, Dr. Robert Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained head injuries.

54. In 2003, an NCAA concussion study concluded that football players who had previously sustained a concussion were more likely to have future concussion injuries. Another 2003 NCAA concussion study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks.[18]"

55. Following these studies, in 2004, the National Athletic Trainers' Association published a position statement, recommending baseline cognitive and postural-stability testing, as well as return-to-play recommendations, including

---

[18] Michael McCrea, *et al.*, *Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study*, *The Journal of the Am. Med. Ass'n* (November 19, 2003), *available at* http://jama.jamanetwork.com/article.aspx?articleid=197668.

holding out athletes who exhibit symptoms of a suspected head injury.

56.     Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of the safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports, based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

57.     Ultimately, while the NCAA knew of the harmful effects of TBIs (and other head injuries) on athletes for decades, they ignored these facts and failed to institute any meaningful methods of warning and/or protecting the athletes, including football players like Plaintiff McClintock and other Michigan student-athletes. For the NCAA, the continued expansion and operation of college football was simply too profitable to put at risk.

**III.    The NCAA Breached Its Duties to Its Student-Athletes, Including Plaintiff Picou, by Ignoring the Dangers of Concussions and Failing to Implement Adequate Concussion Management Protocols.**

58.     For decades, the NCAA has been aware—through its own institutional knowledge, internal research, and current medical science, among other sources of information— that severe and/or repeated head impacts can lead to long-term brain injuries, including memory loss, dementia, depression, and CTE. Unfortunately, while the NCAA knew about the harmful and devastating effects of these sub-concussive and concussive injuries, it recklessly ignored these facts and failed to

implement reasonable concussion management protocols to protect its athletes, including Plaintiff.

59.     Such conduct stands in stark contrast to the NCAA's approach in comparable contexts. For instance, in 1960, the NCAA wholly discontinued its relationship with collegiate boxing following widespread criticism of the sport's dangers and a heightened organizational awareness of the long-term risks student boxers faced—including, but not limited to, developing "punch drunk syndrome." But as to college football, including UWG's football program, the NCAA continued to govern, support, and profit from the sport without disclosing what it knew to student-athletes, including Plaintiff Picou.

60.     Since at least 1933, the NCAA has known of the serious nature of concussions and other head injuries in college football, and even recognized the need for appropriate

concussion management protocols. In its 1933 Sports Medicine Handbook—which it distributed to all member institutions—the NCAA specifically recognized that head injuries warrant special attention and should not be regarded lightly.

61.     The 1933 Sports Medicine Handbook then provided information for school and college doctors, coaches, and trainers to identify the signs and symptoms of concussions, as well as methods to be used on the sidelines for treating them. It discussed head injuries, stating that they "are in a category by themselves and warrant special attention[,]" as they "may be, and often are more severe in their

21

immediate and remote consequences" than other injuries. Notably, the 1933 Sports Medicine Handbook recommended that, when concussion-related symptoms lasted longer than two days, players "should not be permitted to compete for 21 days or longer, if at all." It also stated, "[t]here is definitely a condition described as 'punch drunk' and often recurrent concussion cases in football and boxing demonstrate this[,]" and that "[a]ny individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body- contact sport."

62.     The NCAA recognizes that its Sports Medicine Handbook "may constitute some evidence of the legal standard of care," and has publicly recognized its duty and moral obligation to protect collegiate athletes. As NCAA President Mark Emmert testified to the Senate Commerce Committee in January 2014, "I will unequivocally state we have a clear moral obligation to make sure we do everything we can to protect and support student-athletes."

63.     Indeed, in the September 1968 issue of NCAA News, the NCAA published an article entitled *Dangers of Grid Head Injuries Cited by Safeguards Committee.* In the article, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sport issued a statement on the dangers of repeated head injuries in football, stating:

> [T]hose individuals who have been rendered unconscious, even momentarily, in a given game should never be allowed to play again in the same game and not allowed to return to contact until all symptoms have cleared up entirely and he has been checked by a competent medical authority.

22

64.    Rather than inform Plaintiff and other UWG athletes of these risks or implement protocols to protect and safeguard them from TBI-related injuries (as the NCAA promised to do through the NCAA Constitution, among other things), the NCAA failed to meaningfully adopt or enforce the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

65.    Instead, in complete disregard of the vast body of known scientific evidence and the resources and authority that it possessed, the NCAA failed prior to 2010 to, amongst other things, do any of the following:

- implement adequate guidelines or rules to prevent repeated concussions, and educate players, including Plaintiff, about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football;
- recommend or enforce adequate return to play procedures or take action to educate athletes, including Plaintiff, about the risks of repetitive head injuries;
- conduct a football program that proactively encouraged Plaintiff and other UWG football players to avoid head injuries, instead compelling players to ignore concussion symptoms and continue to play football within moments of experiencing concussion symptoms; and
- contact football players, including Plaintiff, after they left UWG to inform them that they had been exposed to an increased risk of long-term brain damage by the sub- concussive and concussive blows sustained while playing football for UWG.

66.    In April 2010, under mounting public pressure, the NCAA made

changes to its concussion treatment protocols, this time enacting a new policy that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

67.     Under that new policy, which became effective in August 2010, member schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussion."

68.     The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

69.     Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions" and noted that students would be provided educational materials on concussions during the signing process.

70.     This policy is flawed though: due to the very nature of concussions, athletes suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. For example, the types of questions used to screen players for concussions include "What's your name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail

to answer them correctly, despite their very elementary nature. Following logically on that, a player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely dependent on others, such as the NCAA and UWG, to identify concussive injuries in real-time and take appropriate remedial actions. The NCAA has stood in the role of guardian, tasked with making decisions in Plaintiff's and other football players' best interests. The NCAA failed to fulfill that role and instead acted in its own self-interest, to the detriment of its student-athletes, including Plaintiff.

71.    In the end, the NCAA implemented these (still deficient) policies far too late for Plaintiff Picou and other UWG football players.

## FACTS SPECIFIC TO DEQUAVIUS PICOU

72.    Plaintiff Picou played football at the University of Tennessee from 2016 through 2018 and at the University of West Georgia from August 2018 to November 2018.

73.    While playing at University of Tennessee, Plaintiff Picou suffered from a concussion when he hit heads with another player's helmet during a game against Virginia Tech at Bristol Motor Speedway on September 10, 2016.

74.    Plaintiff Picou's teammates noticed he was talking weird and seemed off. When Picou mentioned that his head hurt and that he felt weird to a University of Tennessee athletic trainer, he was told to sit down and shut-up if he wanted to play next week. It was clear that Picou had suffered a concussion.

75.     On December 30, 2016 during the Music City Bowl, Picou was acting stragely and seemed to be off, yet he continued to play as required by the University of Tennessee.

76.     In 2017 Picou's situation deteriorated.  He started acting strangely including yelling at his family.  Previous to his injury, Picou never raised his voice. He was always very kind to everyone, but now he started to seem rude and aggravated by everyone.

77.     Picou lost significant weight because he would only eat limited foods and would work out in the middle of the night.

78.     Picou's academic progress declined significantly because he was not completing school work.  Previously, Picou's academic progress was satisfactory.

79.     Pico started seeing a therapist.

80.     Picou knew something was wrong because he couldn't keep up with each day. He didn't know if it was a complete day or not. He kept up with his days by the amount of water bottles he left on the indoor football field when he would go workout by himself. He believes he spoke to a therapist about this. He says he doesn't really even know what he did and did not tell the therapist about.

81.     In 2018, Picou's situation further deteriorated people were saying he seemed to be "possessed by the devil" and using demonic symbols.

82.     There was an incident at a car dealership. The dealership called the football coaches saying there was a player there acting weird. Ike (mentor) picked

Quay up and took him back to sit with him and Quay's friend John. They took Quay back to his apartment to chill out.

83.    He was hanging out with his friend Kivon Bennett and Kivon called John (was an athletic trainer at UT at the time) and said Quay was saying weird things "talking crazy". John picked Quay up outside the dorm room and Quay was taken to an offsite hospital in Clemson, Tennessee.

84.    At this hospital Picou busted a hole in the wall and ran out of the hospital and was outside of the hospital with no shirt on in the cold and was speaking some random language no one knew.  The police and EMT took him to UT medical center.

85.    Picou was transferred to Peninsula Hospital (psychiatric hospital) and stayed for a week or so.  He appeared better after the stay at Peninsula.

86.    Soon after, the symptoms returned and Ike called ambulance to Quay's apartment and took him back to Peninsula Hospital where he stayed for another week. When he was released,  Picou was forced to sign papers releasing himself to the team, despite not being fully stable.

87.    He was subsequently cut from the team because Picou allegedly "made a threat on snapchat."  Picou told a friend that he was released for using demonic symbols.

88.    In August 2018 he went to University of West Georgia and was placed on the UWG football team.

89.     At the time, Picou was still not acting himself. Within a couple weeks after being at UWG, one late night Picou punched his television and threw it in the wall. He went outside and was screaming in the parking lot and banging his head on a car. Someone called the police. His coaches were called, and they drove him to Tanner Medical Center to check him out and wrap his hand he cut on the television. Coach Cotton called his family to come get Picou.

90.     Picou was picked up and taken home. Picou awoke early the next morning acting strange. He was saying a lot of strange things about "they" were going to get him. He was speaking a different language.  The crisis center weas called and with the assistance of the police took Quay to Peachford Hospital (psychiatric hospital). He was there for a week.

91.     When Picou was discharged, he went back to school. He couldn't sit through class without feeling off. He wouldn't go to class and the coaches were fully aware of this. Quay told Bria's mom, "the coaches worked it out."

92.     During a game at UWG, within a week or 2 after hospital stay, Quay was taken into the training room in the middle of the game because he was having issues with he eyes and was feeling weird. Picou's family was called to the training room and  asked a coach that, due to his medical issues and his lack of getting credit for his classes (that he wasn't going to), why was he not getting redshirted, so he didn't ruin his last year of eligibility. The coach said, "we need him for the playoffs." Quay was taken home.

93.    Quay was seeing a therapist at UWG. Despite his obvious distress, UWG kept playing Picou further exacerbating his injuries.

94.    Picou's last game was November 17, 2018.

95.    Although Plaintiff Picou sustained a serious blow to the head in a game for the NCAA's profit, both the NCAA, University of Tennessee, and UWG failed to adopt or implement adequate concussion management safety protocols or return to play guidelines during his time on UWG's football team. Although Picou's initial injury predated his time with UWG, UWG was fully aware of his medical condition and difficulties and played and continue to play Picou in complete disregard for his safety.

96.    As a result, Plaintiff Picou now suffers from issues including, but not limited to, headaches, short-term memory loss, emotional instability, depression, and suicidal thoughts.

## CLASS ACTION ALLEGATIONS

97.    **Class Definition**: Plaintiff Quay Picou brings this action for himself and on behalf of a Class of similarly situated individuals, defined as follows:

> All individuals who participated in University of West Georgia's football program between 1952 and 2018

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former

employees, officers, and directors; (3) persons  who properly execute and file a

timely request for exclusion from the Class; (4) persons whose  claims in this matter

have been finally adjudicated on the merits or otherwise released; (5)  Plaintiff's

counsel and Defendant's counsel; and (6) the legal representatives, successors, and

assigns of any such excluded persons.

98.     **Numerosity**: The exact number of members of the Class is not

available to  Plaintiff at this time, but it is clear that individual joinder is

impracticable. Upon information and  belief, hundreds of individuals fall into the

definition of the Class.

99.     **Commonality**: There are many questions of law and fact common to

Plaintiff and  the Class, and those questions predominate over any questions that

may affect individual  members. Common questions for the Class include, but are

not limited to, the following:

(a)     Whether Defendant had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

(b)     Whether Defendant had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related brain injuries;

(c)     Whether Defendant's conduct as alleged herein constitutes a breach of duty;

(d)     Whether Defendant's conduct as alleged herein constitutes negligence;

(e)     Whether Defendant's conduct as alleged herein constitutes breach of contract;

(f)   Whether Defendant's conduct as alleged herein constitutes fraudulent concealment; and

(g)   Whether Plaintiff and the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief.

100.   **Typicality**: Plaintiff's claims are typical of those of members of the Class, as  Plaintiff and other members sustained injuries arising out of the same wrongful conduct of Defendant.

101.   **Adequate Representation**: Plaintiff will fairly and adequately represent the  interests of the Class and has retained counsel competent and experienced in complex litigation  and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has  no defenses unique to Plaintiff.

102.   **Predominance and Superiority**: Class proceedings are superior to all other  available methods for the fair and efficient adjudication of this controversy, as joinder of all  members of the Class is impracticable. Individual litigation would not be preferable to a class  action because individual litigation would increase the delay and expense to all parties due to the  complex legal and factual controversies presented in  this Complaint. By contrast, a class action  presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort,  and expense will be fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION NEGLIGENCE**
**(Individually and on Behalf of the Class as Against All Defendants)**

103.   Plaintiff incorporates by reference the foregoing allegations.

104.   From its inception and by virtue of its role as the governing body of college athletics, the NCAA has historically assumed a duty to protect the health and safety of all  athletes at member institutions, including Plaintiff Picou. The NCAA also assumed a duty  of care by voluntarily taking steps to protect and promote the health and safety of its players,  including promulgating safety handbooks and regulations. That duty included an obligation to  supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-  to-date guidance and regulations to minimize the risk of injury to its athletes.

105.   The duties of both defendants included specific obligations to supervise, regulate, and  monitor the rules of the UWG  football program and provide appropriate and up-to-date  guidance and regulations to minimize the risk of long-term and short-term brain damage to   UWG football players, including Plaintiff Picou.

106.   Defendants had a duty to educate UWG football players on the proper ways to  evaluate and treat head injuries during and after football games and practices, including  repetitive concussive and sub-concussive injuries. The Defendant's duties further included a duty to  warn its athletes of the dangers of concussive and sub-concussive injuries and of the risks  associated with football before, during, and after they played college football, and as additional  information

came to light.

107.   Defendants   had a duty not to conceal material information from football players, including Plaintiff Picou.

108.   Defendants   breached its duties owed to UWG   student-athletes, including   Plaintiff   Picou,   by   failing   to   implement,   promulgate,   or   require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in the locker  room, and in the weeks and months after they sustained TBIs, as well as providing treatment for  the latent effects of TBIs. These failings included, but are not limited to:

(a)          failing to adequately recognize and monitor concussive and sub-concussive injuries during football practices and games;

(b)          failing to adequately inform student football players of the dangers of concussive and sub-concussive injuries;

(c)          failing to adequately design and implement return to play regulations  for  student  football  players  who  sustained  concussive  and/or  sub-concussive injuries and/or were  suspected of sustaining such injuries;

(d)          failing to adequately design and implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;

(e)          failing to adequately inform the families of student football players who sustained concussive and/or sub-concussive injuries; and

(f)          failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral  effects of concussive and sub-concussive injuries, after the time student football players, including Plaintiff Picou, left UGA.

109.   Defendants breached their duties to student football players, including

Plaintiff Picou, by failing to disclose and/or failing to recognize and/or being willfully non- observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub- concussive trauma to football players, including Plaintiff Picou.

110.    As a football player at UWG, Plaintiff Picou and those like him relied upon the guidance, expertise, and instruction of Defendants in understanding the risks associated with serious and life-altering concussive and sub-concussive hits in football.

111.    At all times, Defendants had superior knowledge of material information regarding the effects of repeated head injuries, including through its institutional knowledge of such effects. Because such information was not readily available to UWG football players, including Plaintiff Picou, Defendants knew or should have known that they would act and rely UWG and thereafter.

112.    Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as tau protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk

syndrome") studied and reported by Harrison Martland in 1928.

113.   In addition, repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing neurodegenerative disorders and diseases,   including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions, especially when such blows are sustained at an early age.

As a direct and proximate result of Defendants' negligence, student-athletes, including Plaintiff Picou, experienced repetitive concussive and sub-concussive impact during their college football careers, which significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other, similar cognitive-impairing conditions. And indeed, Plaintiff now suffers from, and continues to suffer from, issues including but not limited to headaches, short-term memory loss, emotional instability, depression, and suicidal thoughts.

114.   The repetitive head accelerations and hits to which student-athletes, including Plaintiff Picou, were exposed to presented risks of latent and long-term debilitating chronic illnesses. Absent the NCAA's negligence and concealment, the risk of harm to these student-athletes, including Plaintiff Picou, would have been materially decreased, and they would not have developed serious mental health issues.

115.   As a direct and proximate result of Defendants' negligence, Plaintiff

and the Class  have incurred damages in the form of permanent brain damage, emotional distress, past and  future medical costs, health care costs, home care expenses, other out of pocket expenses, lost  time, lost future earnings, and other damages. Plaintiff and other members of the Class will likely  incur future damages caused by Defendant's negligence.

116.    As such, Defendant is the direct and proximate cause of Plaintiff and the putative  Class's injuries, and is liable to them for the full measure of damages allowed under applicable  law, as well as interest, reasonable attorneys' fees, expenses, and costs.

### SECOND CAUSE OF ACTION BREACH OF EXPRESS CONTRACT
### (Individually and on Behalf of the Class as Against Defendant NCAA)

117.    Plaintiff incorporates by reference the foregoing allegations.

118.    As a football player at UWG, an institution governed by the NCAA, Plaintiff Picou and other UWG football players were required to, and did, enter into contracts with the NCAA as a prerequisite to sports participation. These contracts required Plaintiff Picou and other UWG football players to complete a form affirming that they had read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and further, that they agreed to abide by Division Bylaws.

119.    In exchange for these student-athletes' agreements, the NCAA

promised to perform certain services and functions, including, amongst other things:

> (a)    conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational wellbeing of NCAA athletes;
>
> (b)    requiring that each member institution protect the health of, and provide a safe environment for, each of its participating athletes; and
>
> (c)    requiring that each member institution establish and maintain an environment in which the NCAA athletes' activities are conducted as an integral part of the athletes' educational experience.

120.    By signing and agreeing to abide by NCAA rules and regulations, and thereafter participating in NCAA-sanctioned sports programs in accordance with said rules and regulations, Plaintiff Picou and other UWG football players fulfilled their contractual obligations to the NCAA.

121.    As described in the foregoing allegations, the NCAA breached its contractual agreement by failing to ensure Plaintiff Picou and other UWG student-athletes were provided a safe environment in which to participate in collegiate football. The NCAA further breached its contractual agreement by concealing and/or failing to properly educate and warn Plaintiff Picou and other UWG football players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

122.    Plaintiff Picou and other UWG football players entered into written agreements with the NCAA in which they committed to play football at UWG, to

attend UWG as students, and to comply with all codes of conduct and obligations as both football players and students at UWG.

123.    Plaintiff McClintock and other UWG football players fulfilled their contractual obligations to the NCAA.

124.    The NCAA's contractual breaches caused Plaintiff Picou and other UWG football players to suffer injuries and damages in the form of, *inter alia*, past, ongoing, and future medical expenses, lost time, lost future earnings, and other damages.

125.    As a result of its misconduct, the NCAA is liable to Plaintiff and the Class for the full measure of damages and other relief allowed under applicable law.

## THIRD CAUSE OF ACTION FRAUDULENT CONCEALMENT
## (Individually and On Behalf of the Class as Against All Defendants)

126.    Plaintiff incorporates by reference the foregoing allegations.

127.    Defendants have long understood that repetitive head impacts sustained while playing football created a risk of harm to student-athletes that was similar or identical to the risk boxers faced by participating in boxing practices and matches.

128.    Defendants were aware of and understood the significance of the published medical literature described herein, which detailed the serious risk of short- and long-term brain injury and disease associated with repetitive head impacts, including those to which Plaintiff Picou and other UWG football players were exposed.

129.   Defendants knowingly concealed these risks from Plaintiff Picou and other UWG football players considering whether or not to participate in UWG's football program or in any other NCAA football program.

130.   By concealing these highly material facts, Defendants intended to induce a false belief in Plaintiff Picou and UWG football players like him about the short- and long- term risks of repetitive head impacts in football. As an entity that voluntarily took on the role of governing the sport of football in colleges across the country (including UWG), and which was created and perpetuated specifically to protect player safety, Defendants had a duty to speak about these issues—instead, it remained silent. Defendants intent in doing so was to induce Plaintiff Picou and other UWG football players to continue playing NCAA football, even after sustaining one or more concussions and even when those concussions required additional time to heal.

131.   Plaintiff Picou and other UWG football players could not have reasonably been expected to know or discover the truth about the risks associated with concussive and sub-concussive blows to the head, or were misled from obtaining such truthful information. Plaintiff Picou and other UWG football players were under the care and treatment of Defendants and justifiably relied on the NCAA's silence as representing facts that did not exist.

132.   Given Defendants' superior and unique vantage point, Plaintiff Picou and other UWG football players reasonably looked to Defendants for guidance on

head impacts— and concussions, in particular—as well as the later-in-life consequences of receiving repetitive head impacts during football games and practices at UWG.

133. Defendants failed to act reasonably in light of its omission, including by failing to develop and implement adequate guidelines and rules regarding return-to-play criteria, and other safety procedures. Defendants' inaction and concealment increased the risk of long-term injury and illness in UWG football players, including Plaintiff Picou—and indeed, did result in them suffering from long-term brain injuries and disease

134. As a direct and proximate result of Defendants' knowing concealment and/or willful blindness, Plaintiff Picou and other UWG football players suffered substantial injuries.

135. As a direct result of the Defendants' failure to reveal pertinent information, Plaintiff Picou and UWG football players like him incurred economic and non-economic damages in the form of pain and suffering, permanent brain damage, past and future medical costs, health care costs, home care expenses, other out of pocket expenses, lost time, lost future earnings, and the loss of enjoyment of life.

136. As a result, Defendants are liable to Plaintiff and the Class for the full measure of damages allowed under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dequavius Picou, individually and on behalf of the Class, respectfully requests that the Court enter an Order providing for the following relief:

A.      Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as representative of the Class, and appoint his counsel as Class Counsel;

B.      Declare that Defendants actions, as set out above, constitute negligence, breach of contract, and fraudulent concealment;

C.      Award all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and caused by Defendants conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and all other damages suffered, including any future damages likely to be incurred by Plaintiff and the Class

D.      Award Plaintiff and the Class reasonable litigation expenses and attorneys' fees;

E.      Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

F.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

G.      Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,


Dated: November 17, 2020

/s/ Odis Williams
The Law Office of Odis W. Williams
1640 Powers Ferry Road
Building 20, Suite 300
Marietta, GA 30067
770-575-4466
owilliams@odiswilliamspc.com

Keith Altman
(*pro hac vice to be applied for*)
The Law Office of Keith Altman
33228 West 12 Mile Road - Suite 375
Farmington Hills, MI 48331
516-456-5885
kaltman@lawampmmt.com